UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

IN RE:                                              Case No. 04-34177

    KRISTI S. GRANT
    a/k/a KRISTI MORRIS
    a/k/a GRANT'S APPLIACE

    and

    GREGORY L. GRANT,
    a/k/a Grant's Appliance
        Debtor(s)

_____

ELECTROLUX FINANCIAL CORP.
    Plantiff(s)

vs.                                                 Ad. Proc. 04-3298

KRISTI S. GRANT
    a/k/a KRISTI MORRIS
    a/k/a GRANT'S APPLIACE
and

GREGORY L. GRANT
    a/k/a GRANT'S APPLIANCE

    Defendant(s).

---

MEMORANDUM-OPINION

---

THIS CORE PROCEEDING[1] comes before the Court on Plaintiff Electrolux Financial

Corporation's ("Creditor" or "Electrolux") Complaint Objecting to the Dischargeability of a

_____

[1]*See* 28 U.S.C.§157(b)(2)(K) and (O).

1

Debt. The Creditor alleges that certain debts owed by Grant's Appliance, which the Debtors personally guaranteed, should be deemed nondischargeable under 11 U.S.C. §§523(a)(2)(A),(a)(4), and (a)(6). Based upon the statements of counsel, testimony of witnesses and evidence presented at the evidentiary hearing and the entire record in this case, this Court finds in favor of the Defendants.

Kristi S. Grant and Gregory L. Grant ("Debtors") owned and operated Grant's Appliances, a retail appliance store. In May 2001, the Debtors took over operation of the store from Mr. Grant's parents, who had been in the appliance business for approximately twenty years.

In March 2003, an Electrolux sales representative came to Grant's Appliances, and based upon the representative's information, the Debtors applied for a floor plan financing agreement with Electrolux on March 25, 2003, on behalf of Grant's Appliances. In the application, the Debtors requested a $25,000 credit line payable on a schedule pay basis (*i.e.*, payment due on a specified date each month). The credit application was ultimately approved. According to Ms. Christy Vaught, a default strategist for Electrolux who testified on behalf of the Plaintiff, Grant's Appliance was approved for a "pay as sold plan" not a "schedule pay" plan. "Pay as sold" required that the Debtors pay any outstanding principal in full upon the sale of any inventory item. No evidence was presented or documentation entered showing that the Debtors were ever informed, except for the trust provision buried in the security agreement, that they were to pay Electrolux for each item upon its sale, as opposed to waiting for a bill from Electrolux.

Subsequent to approval, the Debtors signed and returned several documents relating to

their line of credit with the Creditor, including a Security Agreement and a Personal Guarantee signed by both Debtors.  The Security Agreement contained a provision requiring the Debtors to hold the "entire sale proceeds IN TRUST for Secured Party, separate and apart from Debtor's funds and goods." At the time, the Creditor required no proof that a separate trust account was opened or being used.  Subsequent to the Debtors filing for bankruptcy, however, the Creditor implemented a plan where it requests information regarding the trust account.

After  signing  the required paperwork, Grant's Appliance began ordering merchandise through the floor plan financing agreement with Electrolux.  Grant's Appliance was sent monthly statements by Electrolux which listed the items shipped to them and their values.  On the top right corner of each invoice are the words "Display Thru" and a date.  According to Ms. Vaught, the "Display Thru" language meant that the items were "pay as sold" and the accompanying date was the date up until the items should be displayed, and no interest would accrue until that time.  There is no specific language on the invoice that states that payments are due on a "pay as sold" basis.  It was clear from the testimony of Ms. Grant and Ms. Vaught, as well as documentation of calls between Ms. Grant and Electrolux, that Ms. Grant did not understand the "pay as sold" financing plan.  Further, no conclusive evidence was presented that showed Ms. Grant was told that she was supposed to remit payments to Electrolux upon the sale of each item.[2]

Regardless of Ms. Grant's understanding of how she was supposed to treat the proceeds

---

[2]Electrolux submitted evidence of phone logs detailing conversations between Kristi Grant and an Electrolux representative regarding conversations regarding Grant's Appliances account.  It is unclear, however, what was actually explained to Ms. Grant during the conversations regarding her payment responsibilities.  Electrolux did not call the representative who talked to Ms. Grant to elaborate on what was said.  As such, this Court can only take the call logs at face value and cannot import further meaning into them that is not readily apparent.

of any sale of Electrolux merchandise, Grant's Appliance ordered and received approximately $30,000.00 in merchandise from Electrolux. Ms. Grant testified that upon the sale of Electrolux merchandise, she would place the proceeds in the corporate account. She then planned on paying Electrolux upon receiving a statement stating an amount owed from the corporate account. This was the method she followed with her other vendors, including GE, Marcone, Whirlpool Appliances, and Maytag Appliances.

Beginning in July 2003, Grant's Appliances began to suffer business/financial difficulties. As a small business, Grant's Appliances encountered stiff competition from their larger competitors. The Debtors also began to experience marital difficulties, and for various periods throughout 2003 Kristi Grant, who had done the bookkeeping for the business, was not involved in the day-to-day operations of the business. During the Summer of 2003, Grant's Appliance wrote a check for $1,929.00 to Electrolux which was applied to their account. During October 2003, the Debtors wrote two more checks to Electrolux which were both returned on account of nonsufficient funds. Grant's Appliance ultimately closed its business in February 2004.

After filing for bankruptcy, the Debtors placed the unsold Electrolux merchandise in storage. Electrolux repossessed approximately $13,000 worth of inventory from Grant's Appliance in the Fall 2004. At the time of the trial, Electrolux claimed $17,625.22 in outstanding monies owed to it by Grant's Appliance.

The Creditor is now before this Court seeking to have its particular debts incurred by Grant's Appliances deemed nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) against the Debtors as personal guarantors. While each of these provisions provides a

4

separate basis for exceptions to the general discharge, the Creditor is alleging that certain actions

of the Debtors, namely not setting up a trust account as required in the security agreement for the

proceeds of sales of Creditors merchandise and writing two bad checks, should result in such a

finding under each aforementioned statutory provision.  Although there are three separate and

distinct grounds asserted here, any challenge to dischargeability of a particular debt must be

proved by a preponderance of the evidence and is strictly construed against a creditor.  *In re*

*Rembert,* 141 F.3d 277(6th Cir. 1998).  Keeping in mind these standards,  each ground for a

denial of discharge is examined in detail below.

**11 U.S.C. §523(a)(2)(A)**:

     The Creditor first alleges that its claim should be deemed nondischargeable under 11

U.S.C. §523(a)(2)(A), which states:

> (a) A discharge under...this title does not discharge an individual debtor from any debt--
>     (2) for money, property, services, or an extension, renewal, or refinancing of
>     credit, to the extent obtained by –
>         (A) false pretenses, a false representation, or actual fraud, other than a
>         statement respecting the debtor's or an insider's financial condition...

     In order to except a debt from the general discharge under §523(a)(2)(A), the creditor

must prove that: (1) the debtor obtained money by either knowingly materially misrepresenting

information or gross recklessness; (2) the misrepresentation was made with the intent to deceive;

(3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was

the proximate cause of the loss suffered.  *In re Rembert,* 141 F.3d at 280-281(6th Cir. 1998).

Whether or not a debtor possessed the requisite intent to defraud is determined by subjectively

looking at the totality of the circumstances present in a particular case.  *Id.* at 281-282.

     In the present case, the Creditor stated that it extended a floor plan financing agreement

5

based, in part, on the Debtors signing a security agreement containing a provision requiring the Debtors to keep all proceeds from the sale of appliances financed through the agreement in a separate trust account.  The Creditor claims that the Debtors neither opened nor intended to open such an account, and that the extension of credit was therefore predicated on a false representation.

At the evidentiary hearing, the Debtor, Kristi Grant, admitted that she never opened a separate trust account.  She further testified, however, that she did not realize that she was required to do so. There was no contractual language requiring a trust account in the credit application and while it was mentioned in the security agreement, the Creditor offered no proof that the Debtors saw and understood this provision.  The Debtors also testified that the Electrolux sales representative who came to their store  never mentioned a trust account, and the Creditors did not offer any testimony or evidence refuting this claim.

 Ms. Grant did testify that she intended to treat, and did in fact treat, Electrolux in the same manner in which she treated her other vendors, including GE and Maytag Appliances. Upon sale of an Electrolux item, she would deposit the proceeds into the general corporate account.  When the monthly billing statement arrived, she would then write a check from the corporate account to Electrolux.

In addition to following this method of payment with other vendors, Ms. Grant also selected the "Schedule Payment" option on the credit application.  Electrolux claims Grant's Appliance was approved for the "pay as sold" plan.  It does not appear, however, that either Debtor was told of this.  None of the documentation signed by the Debtors following their credit approval stated that they were to remit funds on a "pay as sold" basis.  Further, the monthly

invoices received did not state "pay as sold," although Ms. Vaught stated that "display thru" which was listed at the top of each invoice page was synonymous.

The Creditor attempted to prove Debtors knowledge of the "pay as sold" financing by submitting documentation into evidence of phone logs of calls between Ms. Grant and Electrolux. All this documentation shows is that Ms. Grant was unaware of, at a minimum, how the "pay as sold" payment plan worked and even lends credence to her claim that she was unaware that Grant's Appliance was on such a payment plan.[3] This Court is instead convinced that Ms. Grant was expecting an invoice from Electrolux stating a payment amount and date due, and would then remit the appropriate payment to Electrolux.

As stated above, a finding on nondischargeability under §523(a)(2)(A) requires that the Creditor show that the Debtors made a material false representation with the intent to deceive. The Creditor is unable to meet this burden. Although the Security Agreement did state that all proceeds from the sale of Electrolux merchandise was to be placed in a separate trust account, there is no proof that the Debtors ever saw this provision. This Court finds the testimony of Ms. Grant to be highly credible that she was intending to treat Electrolux in the same manner as her other vendors and remit the amount listed on its monthly statement. Electrolux cannot meet its burden of showing that the Debtors intentionally misrepresented they would set up a trust account in order to receive a line of credit.

**11 U.S.C. §523(a)(4):**

The Creditor next attempts to claim that a its debt should be deemed nondischargeable under §523(a)(4), which states:

---

[3] "[Ms. Grant] is still having some confusion as to when she pay (sic) on spp invs – explained (sic) to her again how it all works." Plaintiff's Exhibit 13.

7

> A discharge under section 727, 1141,1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

To meet the requirements of §523(a)(4), the Creditor must show (1) a pre-existing fiduciary relationship; (2) breach of that relationship; and (3) a subsequent and resultant loss. *In re Blaszak,* 397 F.3d 386, 390 (6th Cir. 2005). The existence of a fiduciary relationship is applies only to an express or technical trust, not an implied trust. *In re Sigler*, 196 B.R. 762, 764 (Bankr. WD KY 1996). To show the existence of an express or technical trust under Kentucky state law, the creditor must show: (1) an expressed intent to create a trust; (2) an ascertainable res; (3) a sufficiently certain beneficiary; and (4) trustee who administers the trust for the beneficiary. *Cumberland Sur. Ins. Co. v. Smith,* 238 B.R. 664, 670-671 (Bankr. W.D. KY 1999).

The Creditor in this case cannot meet the statutory requirements of §523(a)(4). The Creditor seems to argue that because the security agreement states that proceeds are to be held "in trust," a trust agreement, and its associated fiduciary responsibilities, was formed. The mere use of the word "trust" does not create a trust for purposes of §523(a)(4). ("[An] obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334, 55 S.Ct. 151 (U.S. 1934).). There was a contractual obligation between the parties. The Creditor cannot turn this contractual obligation into a fiduciary relationship merely by inserting the words "in trust" into a security agreement. Although no court in the Sixth Circuit has addressed whether floor plan financing agreements should be treated as trusts for purposes of §523(a)(4), numerous courts in other circuits have. *See In re Calvo,* 111 B.R. 1003 (Bankr. MD Fla. 1990); *In re Morrison,* 110 B.R. 578 (Bankr. M.D. Fla. 1990); *In re Theis,* 109 B.R. 474 (M.D. Fla. 1989); *In re Mullins,* 64

B.R. 287 (Bankr. W.D. Va. 1986); *In re Tester,* 62 B.R. 486 (Bankr. W.D. Va. 1986); *In re*

*Gallaudet*, 46 B.R. 918 (Bankr. D. Vt. 1985); *In re Talcott,* 29 B.R. 874 (Bankr. D. Kan. 1983);

*In re Chambers,* 23 B.R. 206 (Bankr. W.D. Wis. 1982); *In re Miles,* 5 B.R. 458 (Bankr. E.D. Va.

1980).   In each of these instances the respective court found that a floor plan financing

agreement does not create a trust but only forms a contractual obligation.  A breach of contract

does not trigger an exception to discharge.  The Creditor's attempt to have its debt held

nondischargeable under 11 U.S.C. §523(a)(4) must, therefore, fail.

**11 U.S.C. §523(a)(6):**

       Finally, the Creditor attempts to have its debt found nondischargeable under §523(a)(6),

which states:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not
> discharge an individual debtor from any debt...for willful and malicious injury by the
> debtor to another entity or to the property of another entity...

In applying this standard, the Supreme Court has declared that the willful and malicious injury

requires a deliberate and intentional injury.  *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974,

140 Ld.2d 90 (1998).  Therefore, the willful and malicious acts must have been done with the

intent of causing injury, and it is insufficient if only the acts, but not necessarily the resulting

injury, were intentional.  *In re Howes,* 246 B.R. 280, 287 (Bankr. W.D. KY 2000).

       The Creditor cannot meet the burden imposed on it  by §523(a)(6).  There has been no

evidence that the Debtors acted with an intent to cause injury to the Creditor. The mere fact that

the Creditor has suffered an injury is insufficient.  Ms. Grant testified that she intended to treat

Electrolux in the same manner in which they treated Grant's Appliances other vendors.

Although the Debtors had only been running the business for a few years, Grant's Appliance was

owned and operated by Mr. Grant's parents for over twenty years.  Even though the Debtors did not follow the procedure for dealing with proceeds of the Creditor's merchandise that the Creditor would have liked, they did  follow a procedure that they had utilized with other vendors. This Court has no reason to believe that the Debtors ever intended not to pay for the merchandise Grant's Appliance received from the Creditor through the floor plan financing agreement. Additionally, the fact that the Debtors wrote two checks which were rejected on account of nonsufficient funds does not lead to such a conclusion.  As stated above, this Court finds the testimony of Ms. Grant credible that she issued the checks thinking that there were sufficient funds in the corporate account to cover them.  Without proof that the Debtors intentionally acted willfully or maliciously, the Creditor's claim that the Debtors' debt should be held nondischargeable under §523(a)(6) must fail.

A separate Order consistent with the foregoing has been entered in accordance with the Federal Rule of Bankruptcy Procedure 9021.